### REVERE SUGAR REFINERY v. STONE & DOWNER CO.

(District Court, D. Massachusetts. December 8, 1922.)

No. 1626.

1. **Sales ⊚⇒68—Sale of goods for export held to reserve right to drawback.**

   Where an article manufactured from duty-paid imported material was sold for export, the sale note providing "no drawbacks for account of buyer," and the price being made lower in consequence of such stipulation, the effect was to reserve the right to the drawback to the manufacturer.

2. **Customs duties ⊚⇒60½—Payment by custom house broker of drawback collected to employer with notice of adverse right held at own risk.**

   Plaintiff sold for export syrup which it manufactured from duty-paid imported sugar, reserving right to the drawback. The buyer, on exportation, employed defendant as custom house broker. On application to plaintiff for the required certificate to show that the article carried a drawback, plaintiff notified defendant that the drawback was for its account, and asked defendant to file entry for it, which notice was acknowledged; but, on collection of the drawback, defendant, without notice to plaintiff, paid it to the buyer, which became bankrupt. *Held*, that defendant made such payment at its own risk and was liable to plaintiff therefor.

3. **Money received ⊚⇒9—Action lies for drawbacks collected by custom house broker and wrongfully paid to another.**

   Defendant, which as custom house broker, collected drawback rightfully belonging to plaintiff, and with knowledge of plaintiff's claim paid the same to another, *held* liable in an action for money had and received.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by the Revere Sugar Refinery against the Stone & Downer Company. Trial to court, and judgment for plaintiff.

Storey, Thorndike, Palmer & Dodge and Harold S. Davis, all of Boston, Mass., for plaintiff.

Warren, Garfied, Whiteside & Samson and Howard Stockton, Jr., all of Boston, for defendant.

MORTON, District Judge. The plaintiff is an importer and manufacturer of sugar and its products, and brings this action to recover certain sums of money alleged to have been received by the defendant from the United States as drawback duties on three lots of syrup manufactured by the plaintiff, which were sold by it to the E. H. Sherburne Company for export, and were subsequently exported. The case was heard jury-waived. There was no dispute that the money had been received by the defendant, as alleged, and paid over by it to the Sherburne Company. The questions at issue are: (1) The plaintiff's right to the money; (2) whether the defendant was justified in paying it over to the Sherburne Company; and (3) whether an action for money had and received, which this is, will lie against the defendant. The Sherburne Company has become bankrupt, and any remedy that the plaintiff might have against it would be inadequate.

The facts are as follows: When products made from sugar or other merchandise which has been imported into this country and has paid a duty, which was the case here, are exported, a drawback of the import duty is allowed. This drawback is payable, according to the Underwood Tariff Act, which was in force when these sales were made, "to the manufacturer, producer, or exporter," his agent or the "person to whom such manufacturer, producer, exporter, or agent" directs it to be paid. 38 Stat. 200. The party named as shipper or consignor in the bill of lading is held to be the exporter, provided that, when the manufacturer or producer shall, on sale, have reserved the right to the drawback, he or his agent may take entry therefor and it shall be paid to him.

In order to collect the drawback, certain prescribed steps have to be taken. Notice of an intent to export the goods and a statement that they have paid the duty must be filed at the custom house, and evidence must be furnished of the exportation of the goods by filing a copy of the bill of lading, and either the arrival of the goods abroad must be shown, or, if payment is desired before that, a bond must be given conditioned for the production of a foreign landing certificate. In this case such a bond was given by the defendant. No claim is made that the condition has not been performed, or that there is now any liability under the bond. The preparation and presentation of the requisite papers and the collection of the drawback is generally left to custom house brokers; the word "brokers" being used in this connection in a sense rather different from its ordinary signification, though the plaintiff, when entitled to the drawback, had sometimes done that itself, and for the last year and a half before the hearing had usually done so.

The syrup in question was sold to the Sherburne Company in August and September, 1919. Both parties understood that it was for export, and the sale notes so stated. The sale notes also contained the words in capitalized letters, "No drawback for account of buyer;" the syrup being sold at a lower price in consequence of this stipulation. They also contained the provision that, "in case syrups sold for export are stored or shipped domestic, the amount of the drawback is to be added to the contract price and domestic discounts allowed"; the idea being that the price charged on sugar or syrups for export plus the drawback would, in such a case, be the equivalent of the regular domestic price. There was evidence tending to show that the Sherburne Company was in poor credit, and the sales were for cash; the syrup being paid for as delivered. At the time of the deliveries the Sherburne Company was not ready for the exportation of the syrup, and, as is customary in such cases, the syrup was stored in a warehouse—in this case the Terminal Warehouse, the transportation thither being by truck or train. Each lot remained in storage until sold by the Sherburne Company to Finlay & Co., by whom it was exported. By the terms of the sale to Finlay & Co., they had no claim upon the drawbacks.

After the sale to Finlay & Co., the Sherburne Company employed the defendant as custom house broker to prepare and present the necessary papers and take the necessary steps to collect the drawbacks. The drawback entry notices, as prepared by the defendant, were sent by it to the Sherburne Company and were handed on by that company to the plaintiff for the requisite certificates (which are the proof that the exported article carries a drawback) to be completed and executed by the plaintiff's officers, which was done, and the papers were then sent by the plaintiff directly to the defendant. Accompanying them in each case was a letter from the plaintiff to the defendant. The letter, with the first papers, was dated January 15, 1920. It stated that the plaintiff "inclosed final drawback entry, notice of intent," etc. "* * * covering shipment of 1,055 barrels of syrup. Drawback for our account"—and asked the defendant "to file entry for us." The letters sent with the other two notices were both dated July 8, 1920. Each contained the statement, "drawback duty for our account," and described the inclosure as "drawback entry," and each asked the defendant "to secure all necessary indorsements of intermediate receipts and deliveries until final exportation, or we will secure same if you will advise us."

To the first of these letters the defendant replied, under date of January 19, 1920, acknowledging receipt of "drawback entry notice of intent," and saying, "As per your request we are filing entry and will secure prompt liquidation of the same." To each of the other two it replied, under date of July 12, 1920, acknowledging receipt in one case of "duty drawback entry covering notice of intent," and in the other of "drawback entry duly executed covering notice of intent," and then going on to say in each case that they notice the drawback "is for your [the plaintiff's] account," and that they are communicating with E. R. Sherburne & Co. to confirm same, as the shipments have been handled for their account.

What the result of the communication was the plaintiff was not informed, though it would seem it naturally might have expected to be, and it received no answer, or only evasive ones, to inquiries made by it from time to time; the defendant taking the view, as it appeared at the hearing, that, since it was employed by the Sherburne Company, it was under no obligation to the plaintiff to disclose to it the state of the business. There was no further correspondence between the plaintiff and the defendant till October 20th, when the plaintiff wrote the defendant two letters, inclosing copies of letters of same date to the Sherburne Company, and saying (among other things) that as to the first lot the plaintiff assumed that the defendant had received no bill of lading, or landing certificate, and, as to the other two lots, that it assumed that they had cleared up with the Sherburne Company that the drawbacks were for the plaintiff's account.

The defendant replied, acknowledging the letters with the inclosures, and saying that the matters alluded to had been referred to the Sherburne Company. No reference was made by the defendant to the fact that the drawback on the first lot (which the defendant had written the plaintiff it would secure prompt liquidating of) had been received and paid over to the Sherburne Company in August, nor to the state of the business in regard to the collection of the drawbacks on the other two lots. The letters to the Sherburne Company called attention to the fact that they had not furnished the plaintiff with bills of lading and landing certificates to enable the plaintiff to collect the drawbacks. The plaintiff also wrote other letters to the Sherburne Company, advising them that, as they had not furnished the papers and information to enable it to collect the drawbacks, they were responsible for the same, with interest, and annexing to the letters statements of account between the plaintiff and the Sherburne Company which included the drawbacks.

The Sherburne Company does not seem to have paid any attention to the letters last referred to, and the plaintiff does not appear to have done anything to enforce the liability thus asserted. The letters would seem to have been written more with the idea of getting from the Sherburne Company such assistance as would enable the plaintiff to collect the drawbacks than with any real intention that the Sherburne Company should pay the amount of the drawbacks. The unsatisfactory state of the Sherburne Company's credit is against the view that the plaintiff relinquished the drawbacks and in effect charged them to the Sherburne Company.

The drawbacks on the two remaining lots were collected by the defendant and paid over to the Sherburne Company in November; but the plaintiff was not notified, and did not have those facts until some time in January, 1921, when one of its employees was permitted to examine the books of the Sherburne Company, which was then in bankruptcy; proceedings against it having been instituted in December. Thereupon the plaintiff made demand upon the defendant for payment of the drawbacks, with interest, and not long afterward brought this action.

[1] 1. It is plain, I think, that the drawbacks belonged to the plaintiff. The effect of the stipulation in the sale notes, "No drawbacks

for account of buyer," was to reserve them for the seller. The syrup was sold at a lower price in consequence of this reservation, and the Sherburne Company has never claimed that the drawbacks belonged to it. The most that it claimed (and this was to the defendant and not the plaintiff) was that they should be paid over to it, and that it would settle with the plaintiff for them, though why it did that, instead of having them paid directly to the plaintiff, does not appear. By the terms of the sale to Finlay & Co. they had no right to the drawbacks. The defendant collected them only as agent, having no beneficial interest in them, except possibly a lien for its commissions, as to which no question arises. The defendant contends that, when the syrup was stored in the warehouse, it was "stored or shipped domestic," within the sale note, and that the effect was to make the drawbacks part of the price to be paid by Sherburne & Co. I do not so construe the clause in question. It means, it seems to me, that, if goods sold for export are diverted into domestic trade, then the seller has the right to charge the drawbacks as part of the price for the goods, and the buyer has the right to the usual discounts. In this case the syrup was never diverted into the domestic trade, but was at all times held for export, and was in fact exported, and the clause is not therefore applicable.

[2] 2. The defendant contends further, in effect, that even if the drawbacks belonged to the plaintiff, taking all of the circumstances into account, it was justified in paying them over to the Sherburne Company. It bases this contention principally upon the fact that the Sherburne Company was its employer. This was the position taken by the defendant in reply to a letter from the plaintiff in March, 1921; the defendant then going into the matter in detail, and insisting in conclusion that it was not liable.

If the fact that the defendant had been employed by the Sherburne Company were all, or if the defendant had remained ignorant of the plaintiff's claim, or if the plaintiff had been a party to the arrangement between the defendant and the Sherburne Company, or had acquiesced in it after learning of it, or had constituted the Sherburne Company its agent, or had by what it said or did, or omitted to say or do, led the defendant to pay over the drawbacks to the Sherburne Company when it would not otherwise have done so—in other words, if authority from the plaintiff were shown, or there were elements constituting an estoppel or an election on the plaintiff's part to look to the Sherburne Company, or a waiver of any claim that the plaintiff might have on the defendant, or agreement by the plaintiff in what the defendant did—the case would stand differently. But the evidence does not, it seems to me, warrant a finding for the defendant in regard to any of these matters.

The case is that money which in fact belonged to the plaintiff came into the hands of the defendant, which had notice that it belonged to and was claimed by the plaintiff. It devolves upon the defendant to show that it was justified in paying over the money to somebody else. The plaintiff cannot be deprived of its money by any arrangement between the defendant and other parties to which the plaintiff did not

expressly or impliedly assent. It is entitled to recover its money, unless it has done or omitted to do something which in equity and good conscience would render it unjust that the defendant should be called upon to pay. The burden is, of course, upon the plaintiff to show that on the case as a whole it is entitled to recover.

The fact that the defendant was employed by the Sherburne Company with the knowledge of the plaintiff might, standing alone, justify the defendant in paying the drawbacks to the Sherburne Company; but here, before paying over the drawbacks, the defendant had explicit notice from the plaintiff that they belonged to it and were claimed by it. The plaintiff never authorized the defendant to pay the drawbacks to the Sherburne Company, nor the Sherburne Company to receive them. There could be no waiver or election by the plaintiff without full knowledge of all the material circumstances, which it is plain that the plaintiff did not have. See Snow v. Alley, 156 Mass. 193, 195, 30 N. E. 691; Moore v. Sanford, 151 Mass. 285, 24 N. E. 323, 7 L. R. A. 151; National Granite Bank v. Tyndale, 179 Mass. 390, 60 N. E. 927; 40 Cyc. Law & Procedure, 349 et seq. The mere assertion of a claim against the Sherburne Company by the plaintiff in some of the letters did not, I think, constitute an election to look to that company, nor a waiver of its right to the drawbacks themselves, especially when made in ignorance of material facts. The whole tenor of the correspondence goes to show, I think, that the plaintiff expected either to take the necessary steps to collect the drawbacks itself, or to have them accounted for to it, if collected by the defendant. In view of the plaintiff's letters, which were evidently written in good faith, it seems clear that the plaintiff was not cognizant, as some of the defendant's witnesses sought to convey the impression that it was, of what was done in the collection of the drawbacks. To say the very least, the defendant and the Sherburne Company failed to furnish the plaintiff information which it was entitled to and had a right to expect. Nor is there any ground for an estoppel; the defendant was not misled by any action of the plaintiff into paying the money over to the Sherburne Company. It seems clear that the plaintiff had no knowledge of the arrangement between the defendant and the Sherburne Company under which the drawbacks were paid over to the latter. And, as above noticed, the plaintiff gave the defendant express notice before the drawbacks were collected that they were to be accounted for to it. Its conduct throughout proceeded upon that assumption and claim.

Taking all the circumstances of the case into account, I am unable to discover any ground on which it can be held that the defendant acted rightly in paying over the drawbacks to the Sherburne Company. It must be held to have done so at its own risk. That it acted in good faith is not sufficient, as between it and the plaintiff, to throw the loss on the latter. It is hardly necessary to observe that the defendant could easily have protected itself, and could not have been compelled to pay them over in advance of the determination of the question whether the plaintiff or the Sherburne Company was entitled to them.

[3] 3. Lastly, the defendant contends that this action for money had and received does not lie against it.

The action for money had and received lies to recover money in the possession of one person that belongs in equity and good conscience to another. See Gaines v. Miller, 111 U. S. 395, 397, 4 Sup. Ct. 426, 28 L. Ed. 466; Wiseman v. Lyman, 7 Mass. 286, 289; Hall v. Marston, 17 Mass. 575; Hills v. Bearse, 9 Allen (Mass.) 407; Colt v. Clapp, 127 Mass. 480; Wiley v. Connelly, 179 Mass. 360, 365, 60 N. E. 784; Knowles v. Sullivan, 182 Mass. 318, 65 N. E. 389; 27 Cyc. Law & Procedure, 849 et seq. It has been sustained in a great variety of cases. It does not depend on contract (Knowles v. Sullivan, supra), though the law implies a promise to pay to, or a trust in favor of, the party entitled to the money. In this case the money was received by the defendant as agent, and it might well be held that the defendant took it on an implied trust to pay it over to the party entitled to it. The defendant's suggestion, that it supposed that the plaintiff's letters meant that the drawbacks were to be collected by Sherburne Company and turned over to the plaintiff, is hardly credible, in view of the defendant's statement in its letters of July 12th that it was communicating with the Sherburne Company to confirm that the drawbacks were to be collected for the plaintiff. Besides, the defendant's letter in regard to the first notice contained no such qualification. There was no evidence warranting a finding of a custom that justified the defendant in paying over the drawbacks to the Sherburne Company. Whether the customs regulations in regard to the payment of drawbacks had been complied with so far as to warrant them in paying over the drawbacks was for the custom house authorities to say. There is no claim that they paid them to the wrong person.

The defendant having received money which belonged to the plaintiff, the law implies a promise to pay it, and an action for money had and received lies.

The rulings and findings requested by the defendant are given and made so far as material and consistent with this opinion, and refused so far as immaterial and inconsistent with the same.

Judgment for plaintiff.